CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
(E-Mail: Cuauhtemoc_Ortega@fd.org)
ADAM OLIN (Bar No. 298380)
(E-Mail: Adam_Olin@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
Telephone: (213) 894-1462
Facsimile: (213) 894-0081

Attorneys for Defendant
MATTHEW GATREL

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW GATREL,<br><br>Defendant. | Case No. 19-CR-36-JAK-1<br><br>**DEFENDANT MATTHEW GATREL'S SENTENCING MEMORANDUM; DECLARATION OF COUNSEL; EXHIBITS** |

Defendant Matthew Gatrel, through counsel, hereby submits this sentencing memorandum for the Court's consideration prior to sentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: April 28, 2022       By  /s/ Adam Olin
_____
ADAM OLIN
Deputy Federal Public Defender
Attorneys for Matthew Gatrel

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ...........................................................................................1

II. LEGAL OBJECTIONS TO THE PRESENTENCE REPORT .....................1

    A.    The PSR Erred In Assessing a Loss Amount.............................................2

        1.    The Commentary Permitting the Use of Gain In Place of Loss Improperly Expands the Plain Meaning of the Guidelines ..............2

        2.    Gain Cannot Be Used In This Case Even Were It Sometimes Permissible ........................................................................................5

            a.    The Gross Gain Figures Are Not a Reasonable Estimate of Loss ........................................................................5

            b.    The PSR Erred In Deeming Gross Sales as Mr. Gatrel's "Gain"........................................................................7

            c.    The PSR Does Not Limit Gain Only to Criminal Conduct.....9

    B.    The PSR Erred in Applying a Number of Victim Enhancement Because No One Suffered Actual Loss Counted In § 2B1.1(b)(1)...........10

    C.    The Court Should Not Apply Both an Enhancement for a Conviction Under 1030(a)(5)(A) and Sophisticated Means ........................................11

III. FACTUAL OBJECTIONS TO THE PRESENTENCE REPORT .........................12

IV. THE APPROPRIATE SENTENCE ...........................................................14

    A.    The PSR Has Overstated the Severity of the Conduct.............................14

        1.    The Evidence at Trial Demonstrated the Services Were Ineffective ...................................................................................14

        2.    The Vast Majority of Specific Instances of Conduct Seen at Trial Centered On Home Connections and Computer Games, Not Critical Infrastructure................................................................16

    B.    The Requested Sentence Is Appropriate In Light of Other Sentences for DDoS Service Operators ..................................................................19

V. CONCLUSION.............................................................................................20

i

# TABLE OF AUTHORITIES

**PAGES(S)**

**Federal Cases**

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019)..................................................................................4, 5

*United States v. Armstead*,
   552 F.3d 769 (9th Cir. 2008) ...................................................................10, 11

*United States v. Bazantes*,
   978 F.3d 1227 (11th Cir. 2020)....................................................................7, 8

*United States v. Bradley*,
   644 F.3d 1213 (11th Cir. 2011) .......................................................................11

*United States v. Bukoski*,
   3:18-CR-154-TMB-MMS (D. Alaska 2018).....................................................19

*United States v. Corrales-Vazquez*,
   931 F.3d 944 (9th Cir. 2019) ............................................................................4

*United States v. Coscia*,
   866 F.3d 782 (7th Cir. 2017) .............................................................................5

*United States v. Crandall*,
   525 F.3d 907 (9th Cir. 2008) .............................................................................7

*United States v. Gallant*,
   537 F.3d 1202 (10th Cir. 2008).........................................................................5

*United States v. Gallegos*,
   613 F.3d 1211 (9th Cir. 2010) ........................................................................12

*United States v. Galloway*,
   509 F.3d 1246 (10th Cir. 2007).........................................................................5

*United States v. Gutman*,
   95 F. Supp. 2d 1337 (S.D. Fla. 2000)................................................................4

*United States v. Heon Seok Lee*,
   937 F.3d 797 (7th Cir. 2019) .............................................................................8

*United States v. Kilbride*,
   2007 WL 2774487 (D. Ariz. Sept. 21, 2007) ....................................................6

ii

*United States v. Kirilyuk,*
 29 F.4th 1128 (9th Cir. 2022) ...................................................................... 3, 4, 5

*United States v. Martinez,*
 2:19-CR-36-JAK-2 (C.D. Cal. 2019) ................................................................ 19

*United States v. Maurello,*
 76 F.3d 1304 (3d Cir. 1996) ............................................................................... 8

*United States v. McMillan,*
 600 F.3d 434 (5th Cir. 2010) .............................................................................. 8

*United States v. Miller,*
 588 F.3d 560 (8th Cir. 2009) ............................................................................ 11

*United States v. Prien-Pinto,*
 917 F.3d 1155 (9th Cir. 2019) ............................................................................ 3

*United States v. Riccardi,*
 989 F.3d 476 (6th Cir. 2021) ....................................................................... 3, 4, 5

*United States v. Schuchman,*
 3:18-CR-95-TMB-DMS (D. Alaska 2018) ........................................................ 19

*United States v. Usatyuk,*
 5:18-CR-461-BO-1 (E.D.N.C. 2018) ................................................................. 18

*United States v. Yeaman,*
 194 F.3d 442 (3d Cir. 1999) ............................................................................... 6

## I. INTRODUCTION

Matthew Gatrel was convicted for his involvement in two services which could be used to conduct illegal DDoS attacks. The Court should sentence Mr. Gatrel, a first-time offender who overcame a violent and traumatic childhood, and whose conduct ended in 2018, to a term of custody of a year and a day, for the following reasons.

First, the Presentence Report contains multiple, significant errors which have inflated the advisory guidelines range beyond any number which could fairly be said to accurately reflect Mr. Gatrel's culpability. Probation erred in assessing a loss based on Mr. Gatrel's alleged gross gain, applying a number-of-victims enhancement where no person suffered an actual loss used to calculate the guidelines, and applying both the § 1030(a)(5)(A)-specific enhancement which is based in part on the sophistication of the offense and the generic sophisticated means enhancement. The base offense level should also be modified to reflect the judgment of acquittal on the wire fraud count.

Second, in sentencing Mr. Gatrel, the Court should reject the PSR's overheated description of the harms allegedly caused by the services. Evidence at trial demonstrated that Downthem sometimes did not function, was weak when it did, and was chiefly used for knocking competitors out of video games or home connections. While still criminal under § 1030(a)(5)(A), the nature of the harm is an important consideration under § 3553(a). While the government and Probation have focused on theoretical victims and conjectural harms, the Court should review the actual evidence of harm when sentencing Mr. Gatrel. The Court should also consider the sentences received by others convicted for operating similar services, which range from terms of probation to short periods of custody.

For these reasons, Mr. Gatrel respectfully requests the Court impose a sentence of twelve months and a day, and three-year term of supervised release.

## II. LEGAL OBJECTIONS TO THE PRESENTENCE REPORT

The Probation Office calculates a total offense level of 31 and criminal history category I. PSR at 4. That calculation results in an advisory guidelines range of 108–135

months. The PSR has erred in its guideline calculation in the following ways: (i) using Mr. Gatrel's gross gain in place of loss under § 2B1.1(b)(1); (ii) applying a number-of-victims enhancement where no individuals suffered actual loss calculated in § 2B1.1(b)(1); and (iii) applying both a sophisticated means enhancement and a four-level enhancement for a conviction under § 1030(a)(5)(A). The base offense level should also be adjusted from 7 to 6 to reflect the post-PSR judgment of acquittal on Count Two, which is the only count that carries with it a twenty-year statutory maximum. *See* § 2B1.1(a); *see also* PSR ¶ 36 (listing statutory maximums for charged counts).

Correcting the guidelines calculation as described herein results in a total offense level of 14, which carries with it an advisory guidelines range of 15–21 months.

## A.   The PSR Erred In Assessing a Loss Amount Based on Gain

The PSR applied a twelve-level enhancement—thereby functionally quadrupling Mr. Gatrel's guidelines range[1]—because Probation contends that Mr. Gatrel received approximately $300,000 in gross gain. PSR ¶¶ 33–36. The Court should reject that enhancement for a number of reasons.

### 1.   <u>The Commentary Permitting the Use of Gain In Place of Loss Improperly Expands the Plain Meaning of the Guidelines</u>

First, the Court should reject the PSR's loss enhancement because the application note substituting the use of gain in place of loss is a policy decision that does not interpret or explain the guidelines, and is therefore not entrusted to the Sentencing Commission acting unilaterally via application notes.

The United States Sentencing Guidelines are the product of collaboration between the legislature and the executive branch. The United States Sentencing Commission, whose commissioners are appointed by the President, *see* 28 U.S.C. § 992(a), draft the guidelines and amendments to the guidelines via the notice-and-comment procedures set forth in the Administrative Procedure Act. *See* 28 U.S.C. § 994(x) (incorporating 5

---

[1] *See* U.S.S.G. § 1A1.4(h) ("A change of six levels roughly doubles the sentence irrespective of the level at which one starts.")

2

U.S.C. § 553). After the notice-and-comment period, the guidelines and amendments are submitted to Congress for review. 28 U.S.C. § 994(p). Those proposed guidelines and amendments become effective only to the extent not revised or rejected by Congress. *Id.* In contrast, commentary to the guidelines does not undergo notice-and-comment review. *United States v. Riccardi*, 989 F.3d 476, 485 (6th Cir. 2021). Thus, the Sentencing Commission can unilaterally amend commentary without subjecting it to the notice-and-comment process (*i.e.*, the foundational requirement of the administrative state) or Congressional disapproval. *United States v. Prien-Pinto*, 917 F.3d 1155, 1157 (9th Cir. 2019) ("However, Congress lacks the power to modify or disapprove of Application Notes, as it may Guidelines.").

This distinction matters. The Ninth Circuit has been "troubled by the Commission's prior attempts to use its interpretive authority to improperly change the scope of a Guideline provision." *United States v. Kirilyuk*, 29 F.4th 1128, 1136–37 (9th Cir. 2022) (cleaned up); *see also id.* (listing examples of such attempts). Most recently, in *Kirilyuk*, the Ninth Circuit invalidated Application Note 3(F)'s "special rule" for stolen or counterfeit credit cards that created a $500 presumed loss for each device. In evaluating the challenge, the Ninth Circuit asked whether that rule was "consistent with the plain meaning of 'loss'?" *Id.* at 1137. The court concluded it was not, because no reasonable person would interpret the term, from among the range of permissible meanings of "loss," to mean a specific number that did not track the loss caused by the crime. *Id.*; *see also id.* ("Application Note 3(F)(i) thus doesn't illuminate the meaning of 'loss,' but modifies it."). While the Sentencing Commission no doubt faced difficulty in estimating loss in these sorts of cases, "*Stinson* makes clear that the role of the Application Notes is to explain the Guidelines, not enact policy changes to them." *Id.* at 1138.

Application Note 3(B)'s substitution of gain in place of loss is no different and cannot survive *Stinson*.[2] While the term "loss" may be subject to some latent ambiguity meriting a specific definition via commentary, the commentary's directive here to use gain in place of loss is not an explanation of the meaning of loss; it is policy. Whatever the outer bounds of the plain meaning of "loss" are, gain is squarely not within them. Instead, gain is an independent proxy to provide *some* number when "loss" cannot otherwise be calculated. *United States v. Gutman*, 95 F. Supp. 2d 1337, 1345 (S.D. Fla. 2000) ("Otherwise stated, [gain from committing a fraud] is an 'alternative method' or 'proxy' of calculating loss when the true loss is not directly or readily measurable."). The $500 per access device dictated by Application Note 3(F)(i) served the same purpose, and was invalidated on that basis. *See Kirilyuk*, 29 F.4th at 1137; *Riccardi*, 989 F.3d at 487 ("[I]f the Commission seeks to keep individuals behind bars for longer periods of time based on this type of 'fictional' loss amount, this substantive policy decision belongs in the guidelines, not in the commentary."). That gain here does not "interpret" loss cannot reasonably be disputed. The commentary itself views them as distinct by using the former when the latter is not reasonably available. And earlier commentary relating to the use of gain conceded that gain "ordinarily will understate the loss," further illustrating the difference between the terms.[3] § 2F1.1 cmt. n. 8 (1987 version).[4]

---

[2] The Ninth Circuit has affirmed decisions involving the use of gain in place of loss. But counsel is aware of no Ninth Circuit authority addressing the issue of whether Application Note 3(B) violates the principles announced in *Kisor* or *Stinson*. Thus, those decisions do not dispose of the challenge here. *See Kirilyuk*, 29 F.4th at 1134–36 (rejecting government's argument that prior cases applying the $500 per device enhancement did not foreclose the *Stinson* challenge because none evaluated it directly); *see also United States v. Corrales-Vazquez*, 931 F.3d 944, 954 (9th Cir. 2019) ("Cases are not precedential for propositions not considered, or for questions which merely lurk in the record.") (cleaned up).

[3] The guidelines also in the section covering Insider Trading uses "gain" instead of loss, reflecting the distinction between them. *See* § 2B1.4 ("If the gain resulting from the offense exceeded $6,500, increase by the number of levels from the table in § 2B1.1….).

[4] The fraud guideline was initially enacted as § 2F1.1 until it was consolidated with § 2B1.1 (then "Larceny, Embezzlement, and Other Forms of Theft") in 2001 via Amendment 617.

4

Because Application Note 3(B) is inconsistent with the plain meaning of loss, it improperly expands the meaning of the actual guideline and cannot apply. [5]

2.   <u>Gain Cannot Be Used In This Case Even Were It Sometimes Permissible</u>

But even were the Court to find Application Note 3(B) survives *Stinson* and *Kisor*, the PSR erred in applying it for the following reasons.

a.   **The Gross Gain Figures Are Not a Reasonable Estimate of Loss**

The PSR also erred in simply accepting the gross gain figures as a *per se* reasonable estimate of loss. Even when using gain in place of loss, it must still be a reasonable estimate of the true loss figure. *See* § 2B1.1, cmt. n. 3(C) ("The court need only make a reasonable estimate of the loss."). For that reason, "[i]f gain to the defendant does not correspond to any actual, intended, or probable loss, the defendant's gain is not a reasonable estimate of loss." *United States v. Gallant*, 537 F.3d 1202, 1237 (10th Cir. 2008). And "before using gain as an alternate estimate of loss, the district court must first estimate the actual and intended loss due to a defendant's fraudulent conduct, and then consider whether the defendant's gain is a reasonable estimate of the actual or intended loss." *United States v. Galloway*, 509 F.3d 1246, 1252 (10th Cir. 2007).

There must accordingly be some means to test the relationship between gain and loss to ensure the former is a reasonable estimate of the latter. Courts thus "will not

---

[5] Even if it concluded Application Note 3(B)'s substitution of "gain" for "loss" survived *Stinson*, the Court should alternatively find the application note violates the narrower deference set out in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). The Ninth Circuit in *Kirilyuk* left open the issue of whether *Kisor* applied given that the application note violated *Stinson*'s more deferential analysis. *See Kirilyuk*, 29 F.4th at 1139 ("We do not express a view on [the Sixth Circuit's application of *Kisor*]."); *see also Riccardi*, 989 F.3d at 486–87 (applying *Kisor* to invalidate the $500 per card commentary). Under *Kisor*, "the possibility of deference can arise only if a regulation is genuinely ambiguous … even after a court has resorted to all the standard tools of interpretation." *Id.* at 2414. And even where there is ambiguity, the agency's interpretation (*i.e.*, the commentary) "must still be 'reasonable' … [i]n other words, it must come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2415–16. Gain is plainly not within the "zone of ambiguity" of loss.

5

substitute gain as a proxy for loss where there is no means of determining whether the defendant's gain is a reasonable estimate of the victim's loss." *United States v. Coscia*, 866 F.3d 782, 801 (7th Cir. 2017) (cleaned up). "The touchstone for the guideline enhancement remains loss, and it follows that gain may be used only when it represents a reasonable approximation of the loss. If there is reason to believe that the gain from an offense greatly exceeds the amount of loss, the gain does not represent a reasonable alternative measure of the loss." *United States v. Kilbride*, 2007 WL 2774487, at *4 (D. Ariz. Sept. 21, 2007); *see also United States v. Yeaman*, 194 F.3d 442, 456 (3d Cir. 1999) ("A court may look to a defendant's gain as an alternative measure but only when … there is some logical relationship between the victim's loss and the defendant's gain so that the latter can reasonably serve as a surrogate for the former.") (cleaned up).

The PSR did not attempt to calculate loss in order to ensure Mr. Gatrel's gross gain had any correspondence to it. Instead, the PSR simply accepted the gross gain figure as a *per se* reasonable estimate of loss. *See* PSR ¶¶ 35–36 ("Thus, it is impracticable to measure harm to and the losses sustained by all the victims. Second, Gatrel's actual gain is instead used as a proxy to reflect the harm caused by Gatrel's services."); Ex. H (correspondence with Probation confirming that Probation took this position). That approach fails to comply with the guidelines' directive that there be a "reasonable estimate" of loss. While in some cases a defendant's gain may be a fair estimate of a victim's loss, such as where a defendant steals an item and sells it, the facts of this case are too far afield for that assumption to apply. There is no basis to conclude that the cost to a user of the Downthem or Ampnode service in any way reflects a victim's loss from internet degradation. For example, what is the financial harm in a home internet connection dropping for a brief period, or latency increasing momentarily in a computer game? No testimony was offered at trial attempting to quantify this. And so there is no means to compare Mr. Gatrel's gross gain figure against a reasonable estimate of loss. As described above, the gain is instead an alternative figure substituted in because there is no basis in the record to estimate loss.

6

Because there is no way to ensure the gross gain reasonably approximates the loss suffered by any potential victims, it cannot be used under § 2B1.1(b)(1).

### b.   The PSR Erred In Deeming Gross Sales as Mr. Gatrel's "Gain"

The PSR moreover erred in using evidence of the amount billed by the two websites as gain for purposes of § 2B1.1(b)(1). *See* PSR ¶ 35 ("For AmpNode's services, Gatrel charged customers approximately $216,407…."). The presentation at trial demonstrated that each site had operating costs because each relied on the availability of servers Mr. Gatrel allegedly procured from server vendors. AmpNode, in particular, was functionally a middleman reseller of servers that the government alleged Mr. Gatrel modified in order to facilitate DDoS activity by others. *See, e.g.*, Sept. 1, 2021 Tr. (P.M. Session) at 24:4–14 ("So he is looking for servers that would be usable for launching amplified DDoS attacks."); Sept. 15, 2021 Tr. at 65:1–6 ("As for Ampnode, well, that's just another tool the defendant offered for the same criminal purpose…. He would provide the spoofing server that would allow you to hide your true IP address."); Sept. 1, 2021 Tr. (A.M. Session) at 106:6–9 ("AmpNode, on the other hand, was providing servers that allowed [abusive] activity, kind of specializing on allowing spoofed DDoS attacks to be launched from the servers that AmpNode was renting to people within here."); *see also* Sept. 1, 2021 Tr. (A.M. Session) at 7:1–4 (Assistant United States Attorney Alexander: "Those are all examples of tickets, communications that the government has alleged are occurring between Mr. Gatrel and third-party server providers that he is attempting to rent servers from in order to operate AmpNode and/or DownThem."). Servers are of course not free. There were thus significant ongoing costs to operate each of the services.

The commentary requires the Court to use net gain, rather than gross receipts, in attributing loss under the alternative method. *See, e.g.*, *United States v. Crandall*, 525 F.3d 907, 915 (9th Cir. 2008) ("Defendants' 'gain' might be valued by comparing Defendants' cost of purchasing the apartment buildings to the gross sale prices of the

7

buildings to the victims."); *see also United States v. Bazantes*, 978 F.3d 1227, 1249 (11th Cir. 2020) ("To calculate their gain [under § 2B1.1(b)(1), the court began with the $5 million in government contracts in which [defendants] had submitted falsified payroll records in all of the federal projects. It determined that, after subtracting for overhead, they netted on average 11.5% of the total contract price, which amounted to a gain of approximately $550,000…..");[6] *United States v. McMillan*, 600 F.3d 434, 459 (5th Cir. 2010) (affirming district court's limitation of "gain" to defendants' salaries because "the majority of the management fees [paid to defendants' company] were actually used for management of The Oath to pay employees' salaries and other administrative expenses," and "[a]s such, the fees represented no gain to the defendants"); *United States v. Maurello*, 76 F.3d 1304, 1311 (3d Cir. 1996) ("In 1991, however, Application Note 8 was amended, deleting 'offender's gross gain' and substituting 'offender's gain.' … Although we do not need to reach this issue in this case, it seems clear that the guidelines no longer endorse 'gross gain' as an alternative measure of loss."). The Court must therefore only use net gain figures under § 2B1.1(b)(1).

And because the government bears the burden to establish loss, it is responsible for providing an evidentiary basis from which to calculate net gain, *i.e.*, what Mr. Gatrel's operating costs were. *See United States v. Heon Seok Lee*, 937 F.3d 797, 817 (7th Cir. 2019) ("Here, the district court realized that its gain calculation needed to assess net profit, not gross revenue, and that it lacked an evidentiary basis to do so…. The government bore the burden to establish a "loss" or "gain" under U.S.S.G. § 2B1.1. Sentencing Lee without a supporting evidentiary record would have constituted clear error." (citations omitted). There is no evidence in the record to determine what Mr. Gatrel's net gain was, and the PSR cited none. *See* PSR ¶¶ 34–36. Without that figure, the Court cannot assess a loss under § 2B1.1(1) based on Mr. Gatrel's gain.

---

[6] The trial court in *Bazantes* moreover rejected the PSR's recommended loss enhancement that would have corresponded with the $5 million gross figure. 978 F.3d at 1249.

### c.   The PSR Does Not Limit Gain Only to Criminal Conduct

Finally, the PSR erred in using the total sales figure of "gain" because it is not all the result of criminal conduct. Whereas Count One (the § 371 conspiracy based on the CFAA) and Count Three (the substantive CFAA charge) required the jury to find some level of intent by Mr. Gatrel to damage computers, the government's theory of prosecution on Count Two's wire fraud charge was that Mr. Gatrel's use of the reflected amplification DDoS method essentially defrauded the owners of the third-party computers. *See* ECF No. 285 at 3 (summarizing the government's position). In granting Mr. Gatrel's Rule 29 motion on that count, the Court found there was no evidence that the spoofed IP addresses were material to the use of bandwidth. *Id.* at 4–5 ("Rather, as discussed above, the design of the protocols called for responses, regardless of the IP addresses."). The Court's grant of the Rule 29 motion is therefore a rejection of the government's categorical approach to liability for the use of the amplified reflection method, which is the technology underlying both Downthem and Ampnode. Because Counts One and Three require an intent to cause damage, the total sales figure does not track Mr. Gatrel's gain.

Gain for purposes of the guidelines must be limited to gain as a result of criminal conduct. For example, in *United States v. Nacchio*, the Tenth Circuit evaluated the insider trading guideline, § 2F1.2, which contained a specific offense characteristic driven by the defendant's gain. 573 F.3d 1062, 1066 (10th Cir. 2009). The district court rejected the defendant's argument that "gain resulting from the offense should comprise only the proceeds that were attributable to [defendant] having traded on the basis of inside information," and instead included all trading during the relevant period, net of costs like share acquisition and taxes. *Id.* at 1068–69. The Tenth Circuit reversed because the guidelines required the court to include only gains that resulted from the offense of insider trading. "Because mere trading does not constitute criminal insider trading, it logically follows that any gain associated with lawful trading should not be considered gain as used to increase a prison sentence." *Id.* at 1072.

1   The same is true here. Because the use of the amplified reflection method is not
2   *per se* illegal, sales associated with the mere provision of a server absent independent
3   evidence of criminal intent in connection with those sales cannot be used for
4   § 2B1.1(b)(1). The PSR used total sales without any attempt to limit the figures to sales
5   tethered to specific instances of criminal conduct. PSR ¶ 35 ("For AmpNode's services,
6   Gatrel charged customers approximately $216,407…."); *see also* Sept. 7, 2021 Tr. (P.M.
7   Session) at 82:19–22 ("So I looked at the total number of purchases within the purchase
8   table tied to Ampnode and I added up the volume of purchases that were depicted. And
9   so the quantity of items sold that were depicted in the database was this $216,000."). The
10  PSR therefore failed to separate gains resulting from criminal conduct, rendering the
11  finding in error.

12  **B.   The PSR Erred in Applying a Number of Victim Enhancement Because**
13  **No One Suffered Actual Loss Counted In § 2B1.1(b)(1)**

14  The PSR also applied a two-level increase under § 2B1.1(b)(2)(A) under the theory
15  that the offense involved ten or more victims. PSR ¶¶ 37–38. But in doing so, the PSR
16  ignored the guidelines' definition of "victim" and failed to identify any individuals who
17  suffered the necessary actual loss as a result of Mr. Gatrel's conduct. The Court should
18  reject the enhancement.

19  The Application Notes define victim, in relevant part,[7] as "any person who
20  sustained any part of the actual loss determined under subsection (b)(1)." § 2B1.1, cmt.
21  n. 1. Actual loss in turn is "the reasonably foreseeable pecuniary harm that resulted from
22  the offense," § 2B1.1, cmt. n. 3(A)(i), and is distinguished from intended loss. "Thus, in
23  order to be counted as a victim, a person must have sustained a loss that is monetary or
24  that otherwise is readily measurable in money, *and* that loss must be included in the loss
25  calculation." *United States v. Armstead*, 552 F.3d 769, 780–81 (9th Cir. 2008) (emphasis
26  in original) (rejecting district court's finding that "there were a substantial number of

27  ───────────────

28  [7] The definition also encompasses individuals who suffered bodily injury as a result of the offense.

10

people involved" as a basis for the enhancement); *see also United States v. Bradley*, 644 F.3d 1213, 1286 (11th Cir. 2011) ("By the plain language of application note 3 to § 2B1.1, a person cannot be counted toward the fifty-victim threshold unless that person suffered bodily injury or a discrete portion of the loss *both* imputed to the scheme *and* used to calculate the offense level increase pursuant to § 2B1.1(b)(1).") (emphasis in original).

The PSR engages in none of this analysis. Instead, the PSR appears to have considered whether there were "victims" in a colloquial sense. Indeed, the whole sum of the PSR's analysis of the victim enhancement—without referencing the definition— merely notes that there was a substantial number of attacks. PSR ¶ 38. But neither of the *Armstead* requirements are met. There are no individuals identified in the PSR (or, at trial) shown to have suffered an actual loss within the meaning of the definition (*i.e.*, actual pecuniary harm). *See United States v. Miller*, 588 F.3d 560, 567–68 (8th Cir. 2009) ("We have already determined that the district court did not clearly err in determining that the government failed to prove any actual loss in this case. It necessarily follows that there were no 'victims' within the meaning of U.S.S.G. § 2B1.1(b)(2)(A)(i)."). And because the PSR used gross gain for purposes of  § 2B1.1(b)(1), even were there such victims, their actual losses were not "included in the loss calculation" and consequently do not count for the enhancement. *Armstead*, 552 F.3d at 780–81.[8]

The Court should therefore reject the application of a two-level increase for ten or more victims.

## C.   The Court Should Not Apply Both an Enhancement for a Conviction Under 1030(a)(5)(A) and Sophisticated Means

Finally, the PSR erred in applying both a two-level enhancement under § 2B1.1(b)(10) for sophisticated means and a four-level enhancement for a CFAA

---

[8] And the existence of victims who suffered a determinable and calculable actual loss would be incompatible with the use of gross gain under § 2B1.1(b)(1) even were it permissible under *Stinson*.

11

conviction under § 2B1.1(b)(19)(A)(i). "Impermissible double counting occurs when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Gallegos*, 613 F.3d 1211, 1216 (9th Cir. 2010). While the same conduct can be the predicate for multiple enhancements, each must "serve[] a unique purpose." *Id.* The two enhancements at issue here serve the same purpose.

Congress directed the Sentencing Commission in 2002 to consider, among other things, "the level of sophistication and planning involved in the offense." Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135 (Nov. 25, 2002). In response, the Sentencing Commission enacted a four-level enhancement in 2003 for violations of § 1030(a)(5)(A). *See* U.S.S.G. amend. 654 (2003). A conviction under § 1030(a)(5)(A), which prohibits the intentional transmission of a "program, information, code, or command" to cause damage to a computer, necessarily involves conduct which could be considered "sophisticated" when compared to a basic fraud offense. But the Sentencing Commission has addressed that, at Congress's directive, in the offense-specific guideline enhancement. Because that enhancement already penalizes the increased sophistication of § 1030(a)(5)(A) offenses, the generic sophisticated means enhancement should not apply.[9]

### III. FACTUAL OBJECTIONS TO THE PRESENTENCE REPORT

Mr. Gatrel also objects to the factual findings made by the PSR. While he objects to the vast majority, including the portions which ascribe conduct to him, he notes certain, specific facts which are unsupported by the record.

- Paragraph 19: At most the evidence reflects that users requested that 200,000 attacks be initiated. But, as set forth herein, the site often did not function, and there is no independent evidence that these attacks

---

[9] Even if the Court concludes the guidelines compel the application of both enhancements, it should vary down two levels under § 3553 because they do not reflect an increased level of culpability.

occurred. And to the extent the paragraph suggests Mr. Gatrel personally initiated 200,000 attacks, it is in err.

- Paragraph 21: There is no evidence that Mr. Gatrel was aware of any individual named David Bukoski or a service known as Quantum Stresser.

- Paragraph 22: This is a legal conclusion not supported by the evidence. At most he could be deemed a co-conspirator of specific users who sufficiently explained their purpose to Mr. Gatrel so as to rise to the level of requisite intent.

- Paragraph 23: As discussed *supra*, Mr. Gatrel objects to there being "innumerable" victims.

- Paragraph 24: The PSR misstates the testimony at trial. Mr. Tzvetanov testified about the concept of overprovisioning, but did not allocate that responsibility to Mr. Gatrel's conduct specifically, but rather as a phenomenon in the field. Further, as set forth further herein, there was no evidence of "life threatening consequences" or companies "put out of business." There is further no evidence of individuals paying more money in web service due to Mr. Gatrel specifically. The Court is sentencing him on his own conduct, not that of other persons who may have committed similar harms. *See also* ECF No. 285 at 4 ("Given that unlimited data plans are common, it cannot be presumed that there was an incremental cost.").

- Paragraph 34: As described *supra*, there is no evidence of loss.

- Paragraph 19 (Part B, page 14): Mr. Gatrel did not state that he is interested in moving overseas.

## IV. THE APPROPRIATE SENTENCE

### A.   The PSR Has Overstated the Severity of the Conduct

The PSR has substantially overstated the severity of the offense by asserting, without evidentiary support, dire harm including "life threatening consequences for Internet-connected medical devices" and "[s]maller companies [who could] get put out of business." PSR ¶ 24. The recommendation similar asserts, without support, "Gatrel's efficacy in causing widespread damage," ECF No. 276 at 5, or ability to cause "power outages," *id.* at 6. Respectfully, the evidence at trial does not reflect this.

As the Court is aware, the government prosecuted this matter essentially as a conspiracy about the operation of the site, rather than about any specific damage to any one specific computer. *See* ECF No. 11 (Indictment).[10] Indeed, because the CFAA permits a conviction based solely on an attempt to "damage" a computer, which is defined as having the *de minimis* threshold of "any impairment to the integrity or availability of data … [or] a system," 18 U.S.C. § 1030(e)(8), and for the reason that factual impossibility is no defense to attempt, the government had no need to establish at trial any particular level of power for the services. Tellingly, the government called no witnesses from any "victims" and instead sought to establish the function of the services and Mr. Gatrel's state of mind, either in terms of conspiratorial agreement or aiding-and-abetting. While that may suffice to establish guilt under the CFAA, it does not mean the services were the sorts of threats described by the PSR, which is directly relevant to the appropriate punishment under § 3553(a)(1).

#### 1.   The Evidence at Trial Demonstrated the Services Were Ineffective

The only quantifiable evidence offered at trial demonstrated that the Downthem service was weak and incapable of inflicting the level of devastation the PSR asserts.

---

[10] Count One alleged a § 371 conspiracy in violation of the CFAA and Count Two alleged a wire fraud conspiracy under § 1349. While Count Three alleged a substantive violation of the CFAA, it did so on the basis of a mixture of aiding-and-abetting and principal responsibility which caused or attempted to cause damage. In any event, only passing reference was made to any specific computer during trial, and no verification of any claimed damage was shown.

14

And no evidence was offered as to the efficacy of servers procured through Ampnode, as the government never tested or acquired one. With respect to Downthem, it appeared to be little more than smoke and mirrors. Despite Agent Peterson purchasing a plan that promised up to 20 gigabits per second, Sept. 14, 2022 Tr. (A.M. Session) at 15:5–20, there is no evidence that it was capable of such feats. In his testimony, Mr. Tzvetanov testified that the average stream of data for the *largest* of Agent Peterson's packet captures was approximately 37.3 megabits per second, far below the strength of a normal home internet connection. Aug. 31, 201 Tr. (A.M. Session) at 103:21–104:2.[11] Mr. Tzvetanov also testified that it was his experience that the "low end of the range" for services like Downthem was five gigabits per second. *Id.* at 109:14–16.[12] On direct examination, Mr. Tzvetanov opined that the sort of attack reflected in one of the packet capture data files (referred to at trial as the "PCAP"), if brought against a home connection, would be minimal: "[i]f somebody is watching Netflix, they will probably see the buffering sign. If they are playing a game, this will cause severe delays in managing their Avatar." Aug. 27, 2021 Tr. (P.M. Session) at 127:14–24; *see also id.* at 128:17–19 ("Now, also just the caveat that there will also be home user like Comcast business users, and for them, this will be nothing.").

The site also often did not work. Agent Peterson testified that in his use of Downthem that the service only had an "effect" on three of the twelve occasions. Sept. 7, 2021 Tr. (P.M. Session) at 93:4–10. He also attempted to test Downthem on another occasion, at which point it did not function. *Id.* at 95:19–23. And despite using the site on FBI-controlled IP addresses in Alaska (which has some of the nation's worst internet) and cooperating servers in California, Agent Peterson did not testify that it knocked those

---

[11] Mr. Tzvetanov argued the 37.3 megabits per second figure understated the power of the attack but offered no testimony as to what it should be. In any event, the figure is far lower than even a single gigabit per second, *i.e.*, 1000 megabits per second.

[12] While the transcript states incorrectly reads "gigabytes," in context it is clear Mr. Tzvetanov would have been using gigabits, as the latter is the more commonly used unit for web traffic.

15

connections offline. Tickets seen at trial (*i.e.*, those culled by the government from among the full database) contained complaints of Downthem's inability to cause the claimed harm. For example, one customer complained that the plan "has no power to take down 20 Gbps DDoS protection Ragnarok online[13] server." Sept. 14, 2021 Tr. (A.M. Session) at 21:19–22. Another stated he or she "tried your special ACK [attack method], but I can't take it down." *Id.* at 23:11–15; *see also id.* at 24:17–18 ("This user is telling Mr. Gatrel that the service is not working against this IP at this specific date and time."); *id.* at 24:9–12 ("And frequently throughout my investigation, I saw Mr. Gatrel explain to many customers that the absolute upper limit, generally, of his service, was that he could not take down with reliability OVH SAS."). While the operator of Downthem made grandiose claims of potency, they are not borne out by the evidence.

2.    The Vast Majority of Specific Instances of Conduct Seen at Trial Centered On Home Connections and Computer Games, Not Critical Infrastructure

The government's witnesses testified at length about various tickets the government contends demonstrate the damage caused by Mr. Gatrel's conduct. And the overwhelming weight of those tickets focused on intended targets like home internet connections and computer games. Hence, for example, for the Downthem tickets that Agent Peterson reviewed that made reference to the potential target, the theme was that the services were being used to interrupt home internet and computer game-related connections:

- G.B.[14] 511: "The home connections I don't think needs definition. That's relatively self-explanatory. And that is a term that would repeat because that

---

[13] Ragnarok Online was a massive multiplayer online game that was hosted on online servers, like those operated by NFO and OVH.

[14] The tickets for each database were admitted in combined form for each of the two databases, rather than individualized tickets. "G.B." refers to the government's internal pagination for the Downthem tickets, which are contained in Government Exhibit 9.

was -- many customers, their focus and their desire was the disruption of home connections." Sept. 7, 2021 Tr. (A.M. Session) at 67:17–21; *see also id.* at 74:7–9 ("In the context of this message and what the user appears to be communicating is, they're saying they have a desire to cause the Internet in a household to go off.")

- G.B. 356: "You see where User 1 says 'game server I presume' and then asks about what the customer wanted in terms of attack time and frequency?" *Id.* at 76:20–22.

- G.B. 301: "[S]o that IP would then be owned or assigned to Verizon, and then Fios being a specific type of Verizon Internet service." *Id.* at 82:11–13; *id.* at 83:1–2 ("I just downed Fios and Google Fiber two nights ago while gaming….").

- G.B. 397: "TS3 or TeamSpeak 3 being a voice communication platform," *id.* at 94:8–9, which is associated with video gaming.

- G.B. 486: "I think my plan has no power to take down 20 [Gbps] DDoS protection." *Id.* at 96:14–15. While Agent Peterson did not read the rest of the sentence contained in the ticket on direct, it is the same ticket relating to the Ragnarok Online server discussed *supra*.

- G.B. 531: Though Agent Peterson skipped the portions of the ticket describing the intended target, the customer stated that the community was "a game server base on source valve." Source is a video game engine developed by Valve Corporation.

Other witnesses similarly testified about communications relating to these sorts of targets. *See, e.g.*, Aug. 27, 2021 Tr. (P.M. Session) at 106:24–107:11 ("Do you have an understanding of what 'I have been in the booting game since Halo 2 days' means? … [Mr. Tzvetanov] Booting is a known term in the underground, which it presents booting somebody out of a computer game."); Sept. 1, 2021 Tr. (A.M. Session) at 59:4–7 (Dr. McCoy: "So 'TS' means 'team speak,' and 3 is just the version of team speak. It's a voice

chat service that is commonly used by gamers to communicate and coordinate with each other while they are playing the video game."); *id.* at 99:4–13 (Dr. McCoy: "So the operator is saying these short attacks are effective at achieving the objective of booting, or kicking people out of Xbox live games.").

Put simply, had there been evidence that the services had in fact wrought the sort of destruction beyond home connections and computer games suggested by the PSR, it would have been seen at trial. But it was not, and the evidence does not support that Downthem or Ampnode were capable of the damage asserted by the PSR.

\* \* \*

Agent Peterson's testimony regarding a series of attacks directed toward a hosting service known as Data Wagon probably best serves as a microcosm for the entire enterprise. Previously in the trial, Dr. McCoy testified regarding an email interaction between Data Wagon and whom the government contends is Mr. Gatrel, in which the individuals corresponding begin feuding and the Data Wagon representative tells the other person "to stay on hack forums where you belong." *See* Sept. 1, 2021 Tr. (P.M. Session) at 30:12–33:6. Agent Peterson testified that the Downthem database reflects approximately two hours of attacks initiated from Downthem against an IP address associated with Data Wagon near the time of this exchange. Sept. 7, 2021 Tr. (A.M. Session) at 57:6–20. But when the individual speaking to the Data Wagon representative mocks the latter, saying "[y]ou should keep your site online, nerd," the Data Wagon representative counters that the site in fact is online. Sept. 14, 2021 Tr. at 17:13–21. Even after two hours of sustained attacks, against someone the attackers were motivated to harm, there were no results.

That is what the evidence consistently showed at trial: outlandish claims, fanciful promises, and hollow threats, but no widespread damage of critical infrastructure. Though criminal, this conduct does not rise to the level of the severe, life-threatening harm the PSR claims. The Court should sentence Mr. Gatrel accordingly.

## B.     The Requested Sentence Is Appropriate In Light of Other Sentences for DDoS Service Operators

The requested sentence moreover is reasonable given sentences given to other individuals convicted of operating similar services.

- *United States v. Usatyuk*, 5:18-CR-461-BO-1 (E.D.N.C. 2018): Defendant sentenced to 13 months for his part operating a DDoS service even after being contacted by the FBI and told to cease his involvement. ECF No. 28 (Gov't Sentencing Memorandum) at 2; ECF No. 47 (Judgment).[15]

- *United States v. Martinez*, 2:19-CR-36-JAK-2 (C.D. Cal. 2019): Mr. Gatrel's co-defendant, who admitted to co-administering the site, sentenced to probation.

- *United States v. Bukoski*, 3:18-CR-154-TMB-MMS (D. Alaska 2018): Mr. Bukoski operated Quantum Stresser which was discussed at Mr. Gatrel's trial. Mr. Bukoski was sentenced to probation despite offering DDoS services to "approximately 70-80,000 subscribers." *See* ECF No. 95 (Gov't Sentencing Memorandum) at 6.[16]

- *United States v. Schuchman*, 3:18-CR-95-TMB-DMS (D. Alaska 2018): Mr. Schuchman created botnets (which relies on infecting unwitting devices in order to control them) for the purpose of DDoS attacks. Per the plea, more than 100,000 devices were compromised, and the botnets were able to create approximately one terabit (*i.e.*, 1000 gigabits) per second of traffic. ECF No. 89 (Plea Agreement) at 7–8.

---

[15] While Mr. Usatyuk pleaded guilty, that difference between these cases is already reflected in a three-level difference in the guidelines. *See* § 3E1.1.

[16] And despite the government being aware that Mr. Bukoski earned "at least $101,273" while running the service, it did not seek an eight-level enhancement under § 2B1.1(b)(1). *United States v. Bukoski*, 3:18-CR-154-TMB-MMS (D. Alaska 2018), ECF No. 95 (Gov't Sentencing Memorandum) at 16.

19

1    Mr. Schuchman was sentenced to time served, which appears to be

2    approximately a year and a day. *See* ECF No. 122 (Def't Sentencing

3    Memorandum) ("By the sentencing date, [Schuchman] will have served

4    approximately 11-months in custody. If the parties' recommendation

5    [of a year and a day] is adopted by the Court, the sentence would be a

6    credit-for-time-served sentence….").

7    With respect to at least Mr. Bukoski and Mr. Martinez's probationary sentences, a

8    somewhat reduced sentence as compared to Mr. Gatrel is warranted. But on the whole,

9    these cases indicate that defendants are not sentenced anywhere near the time in custody

10   recommended by Probation. The requested sentence of a year and a day fits within range

11   of sentences courts impose for these sorts of offenses, particularly when considering Mr.

12   Gatrel's personal circumstances.

13                                **V. CONCLUSION**

14   For the foregoing reasons, Mr. Gatrel respectfully requests that the Court sentence

15   him to a term of 12 months and a day in custody and a three-year period of supervised

16   release.

17                                Respectfully submitted,

18                                CUAUHTEMOC ORTEGA
                                  Federal Public Defender
19

20

21   DATED:  April 28, 2022          By */s/ Adam Olin*
                                     _____
22                                   ADAM OLIN
                                     Deputy Federal Public Defender
23                                   Attorneys for Matthew Gatrel

24

25

26

27

28